IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| K.S. and C.S.,      )<br>     Plaintiffs      )<br>                         )<br>         v.                )<br>                         )<br>WARWICK SCHOOL COMMITTEE, by and )<br>through Jennifer Ahern sued in her capacity )<br>as Chairperson of the Warwick School )<br>Department and MARY LEONE, )<br>individually and in her capacity as Manager, )<br>chairperson and representative for Warwick )<br>Public Schools and HEIDI FANION, )<br>individually and in her capacity as Social )<br>Worker for the Warwick Public Schools )<br>     Defendants      ) | No. 1:17-cv-00258-MSM-LDA |

MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

The saga behind this case began many years ago when K.S., twenty-seven (27) years old at the time of this writing, a student educated by the Warwick Public School System,[1] was first provided with an Individualized Educational Plan, known familiarly as an "IEP."[2]  She has studied with the benefit of an IEP since at least

---

[1] While Warwick had legal responsibility for K.S.'s education, she was not always educated at schools within the District.  For a period of time she received educational services at Bradley Hospital and, following that, at a residential educational placement in Connecticut.

[2] Public school districts must develop IEPs for those who suffer from a disability.  K.S. suffers from a variety of conditions that hinder her ability to learn in an unmodified traditional setting.  As the parties agree that K.S. is disabled, there is no need to

2011.  Her longtime energetic advocate, throughout this case and likely throughout her entire school life, has been her mother, C.S.

Although this case had its official beginning when filed on May 27, 2017 (ECF No. 1), its roots are embedded in the matter of *K.S. et al v. Rhode Island Board of Education, et al,* C.A. No. 14-cv-00077-MSM-LDA.  That was a civil action brought by K.S. and another class representative to require Rhode Island to continue her free public education until she reached the age of twenty-two (22).  Rhode Island's regulations at that time terminated educational services to the disabled when they reached twenty-one (21) years of age.  On appeal, the First Circuit granted class relief and ordered the state to "provide a Free Appropriate Public Education ("FAPE") to students with disabilities up to the age of twenty-two (22).  *K.L. v. R.I. Bd of Educ., et al,* 907 F.3d 639, 651 (1st Cir. 2018).[3]

In connection with the class action, K.S. was provided services to the age of twenty-two (22).  In this lawsuit, which is completely distinct from the class action, she complains that those services were inadequate.  She has exhausted administrative remedies and in Count I of her complaint she takes issue with the Department of Education administrative decision (hereinafter "Adm. Dec") (ECF No. 20-5).  Counts II and III allege retaliation in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203 and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  The Title II claim is brought on behalf of K.S. alone, while

---

detail those conditions.  Any conditions relevant to this decision will be noted in the text.

[3] K.S. aged out of the class, so she was replaced as a named plaintiff.

the § 504 claim is brought on behalf of both K.S. and her mother, C.S.[4] Finally, Count IV alleges retaliation against both K.S. and C.S. in violation of the First Amendment to the United States Constitution.[5]

The case is before the court on the parties' cross-motions for partial summary judgment on Count I, the administrative appeal. (ECF Nos. 19 and 28) and the defendants' motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) on the remaining Counts. (ECF No. 28). For the reasons that follow, I GRANT the

---

[4] Even though C.S. is herself a non-disabled person, she has standing under the Rehabilitation Act "to assert a claim of retaliation against her personally for complaints made on behalf of [a disabled child]." *Weber v. Cranston School Comm.,* 212 F.3d 41, 48-49 (1st Cir. 2000).

[5] Both the ADA and the Rehabilitation Act prohibit retaliation against a person for the exercise of protected rights. *Weber,* 212 F.3d at 45 (§ 504 "incorporate[s] the 'remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964" which, at 34 C.F.R. §100.7(e) prohibits retaliation). Title II, the ADA, specifically prohibits discrimination "against anyone because the person has opposed any practice made unlawful by this chapter or because they made a charge or participated in an investigation …." 42 U.S.C. § 12203(a). The Rehabilitation Act, § 504 incorporates Title VI of the Civil Rights Act of 1964 by "prohibit[ing] recipients from discriminating against any individual … because he has made a complaint … under this part." 42 U.S.C. § 1415, § 504. K.S. and C.S. also press a direct constitutional claim, contending they were retaliated against for exercising their First Amendment right to seek redress of grievances through the filing of a lawsuit. *Gonzalez-Droz v. Gonzalez-Colon,* 660 F.3d 1, 16 (1st Cir. 2011) ("A party seeking to establish a claim of retaliation under the First Amendment must show that the conduct in which he engaged was a 'substantial' or 'motivating factor' in the challenged decision.").
    The IDEA expresses a clear acknowledgement of the "central role" parents play in ensuring that their disabled children are appropriately educated. *Weber v. Cranston Sch. Comm.,* 212 F.3d 41, 51 (1st Cir. 2000). It both designates parents as part of the IEP team and mandates that "parents must be 'members of any group that makes decisions on the educational placement of their child, …" *Id.* Parents may, therefore, sue for retaliation against themselves as well as against their children. *Id.* C.S. seeks redress, therefore, for retaliation against both herself and K.S.

defendants' Motion for Summary Judgment as to Count I and defer decision on their Motion for Judgment on the Pleadings.

## JURISDICTION

The Court has federal question jurisdiction under 28 U.S.C. § 1331, 1343(a) and 1343(a)(4) because the rights to education asserted, and to be protected from retaliation in that context, arise under federal statutes. With respect to the administrative appeal, it lies from the hearing officer's final decision. 20 U.S.C. § 1415(i)(2)(A). As to Count IV, 42 U.S.C. § 1983 gives the Court jurisdiction over a claim for direct violation of constitutional rights.

## EDUCATIONAL RIGHTS

There are a number of federal statutes developing the right of persons with disabilities to education and to various protections within the context of educational services. Chief among them is the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*, which guarantees each student a Free Appropriate Public Education ("FAPE") tailored to his or her needs.[6] A student is entitled to a

---

[6] IDEA is a comprehensive federal education statute which grants disabled students the right to a public education, provides financial assistance to states to meet their educational needs, and conditions a state's federal funding on its having in place a policy that ensures that a "free appropriate public education" is available to all children with disabilities. 20 U.S.C. § 1412(a)91). A stated purpose of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." *Id.* § 1400(d)(a)(A).

*Weber v. Cranston School Comm.,* 212 F.3d 41, 44, n.1 (1st Cir. 2000).

FAPE "that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; …" 20 U.S.C. § 1400(d). To effectuate that entitlement, the IDEA includes a right to an Individualized Education Program (IEP), to evaluations and to certain procedural safeguards. 20 U.S.C. § 1414 (b) and (d). "The 'primary vehicle' for delivery of a FAPE is an IEP." *D.B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012). The IEP has been called the "centerpiece of the IDEA's system for delivering education to disabled children." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010). An appropriate public education includes "instruction and support services sufficient 'to permit the child to benefit educationally from that instruction.'" *Roland M. v. Concord School* Committee, 910 F.2d 983, 987 (1st Cir. 1990).

But the educational landscape for persons with disabilities is broader than the IDEA:

> Important as the IDEA is for children with disabilities, it is not the only federal statute protecting their interests. Of particular relevance to this case are two antidiscrimination laws – Title II of the Americans with Disabilities Act (ADA, 42 U.S.C. § 12131 *et seq.*, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794 – which cover both adults and children with disabilities, in both public schools and other settings. Title II forbids any "public entity" from discriminating based on disability; Section 504 applies the same prohibition to any federally funded "program or activity." 42 U.S.C. §§ 12131-12132; 29 U.S.C. § 794(a). A regulation implementing Title II requires a public entity to make "reasonable modifications" to its "policies," practices, or procedures" when necessary to avoid such discrimination. 28 C.F.R. § 35.130(b)(7)(2016); see *e.g., Alboniga v. School Bd. of Broward Cty.,* 87 F.Supp.3d 1319, 1345 (S.D.Fla. 2015) (requiring an accommodation to permit use of a service animal under Title II). In similar vein, courts have interpreted § 504 as demanding certain "reasonable" modifications to existing practices in order to "accommodate" persons with disabilities. *Alexander v. Choate,* 469 U.S. 287, 299-300, 105 S.Ct. 712, 83 L.Ed.2d

> 661 (1985); see *e.g., Sullivan v. Vallejo City Unified School Dist.,* 731 F. Supp. 947, 961-962 (E.D.Cal. 1990) (requiring an accommodation to permit use of a service animal under § 504). And both statutes authorize individuals to seek redress for violations of their substantive guarantees by bringing suits for injunctive relief or money damages. See 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 12133.

*Fry v. Napoleon Comm'y Sch.,* \_\_\_\_ U.S. \_\_\_\_, 137 S.Ct. 743, 749, 197 L.Ed.2d 46 (2017).

The IDEA contains a formal structure for resolving disputes, 20 U.S.C. § 1415(b) through (i), beginning with a due process hearing before an administrative agency and culminating in the right of an unhappy parent or child to seek redress via a civil action in a state or federal court. 20 U.S.C. § 1415(i)(2)(A). K.S.'s core complaint is that she was denied a meaningful FAPE both before and during the year between her 21st and 22nd birthdays when she aged out of her right to publicly-provided special education services. By filing a complaint and pursuing it through an administrative hearing, she has satisfied the exhaustion requirement of the IDEA.

Satisfying the IDEA's administrative procedures not only carries with it the right to seek judicial review of the IDEA cause of action, but also permits a plaintiff to complain of the identical lack of a FAPE under both "the ADA, the Rehabilitation Act, or similar laws …" *Fry,* 137 S.Ct. at 750.[7]

---

[7] Moreover, satisfying the IDEA's exhaustion requirement of a due process hearing also satisfies administrative exhaustion "required before filing [a] retaliation claim in federal court pursuant to Section 504 of the Rehabilitation Act and 42 U.S.C. § 1983." *Weber,* 212 at 51-52- (petitioner had not exhausted with respect to her §§ 504 and 1983 retaliation claims because she had failed to "invoke the due process hearing procedures of IDEA …").

6

I.

## THE IDEA APPEAL

### STANDARD OF REVIEW

Count I is an appeal by K.S. from the administrative decision following the due process hearing conducted by the Rhode Island Department of Education (RIDE) pursuant to the IDEA.  On April 28, 2017, an administrative hearing officer at RIDE issued a decision that found in favor of the City.  RIDE concluded that, based on a series of factual findings, there was no denial of a FAPE to K.S.  K.S. had the burden of proof at the IDEA hearing, *Schaffer v. Weast,* 546 U.S. 49, 62, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005), and she continues to carry the burden of proof as the appellant here.  *Roland M. v. Concord School Committee*, 910 F.2d 983, 991 (1st Cir. 1990).

The facts are largely undisputed, while the interpretation and significance of those facts are not.[8]  The Court's review is a "bounded, independent decision [ ] – bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court."  *Roland M. v. Concord School Committee*, 910 F.3d 983, 989 (1st Cir. 1990).  The court is not bound by the findings of fact, but must be "deferential, recognizing 'the expertise of the administrative agency, …consider[ing] the [agency's] findings carefully and endeavor[ing] to respond to the hearing officer's resolution of each material issue."  *Id.* at 991.  The First Circuit has explained that the applicable standard in reviewing

---

[8] Unless otherwise noted, the facts surrounding the testimony at the administrative hearing are taken from the Administrative Hearing Officer's Decision, which outlines the testimony in detail.  (ECF No. 1-3, pp 4-30).

an administrative decision under the IDEA "falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard." *D.B. v. Esposito*, 675 F.3d 26, 36 (1st Cir. 2012). *See also*, *Rafferty v. Cranston Pub. Sch. Comm.*, 315 F.3d 21, 25 (1st Cir. 2002) (describing review as "intermediate," requiring "a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review.").

In this case, the precise niceties of the above formulations need not overly concern us. After reviewing the decision, the memoranda, Statements of Disputed and Undisputed Facts filed by the parties, and the exhibits, and after holding a hearing on the pending motions, I am in agreement with the findings of fact made by the administrative hearing officer, with her interpretations of the evidence, and with the conclusions applied. The administrative hearing officer applied the correct law to those findings of fact. Whether I view the evidence with fresh eyes or through the lens of deference to an agency's expertise, I arrive at the same place: For the reasons that follow, the court affirms the decision of the agency below, DENIES the appeal of K.S. from that decision, and GRANTS summary judgment to all defendants on Count I.

## BACKGROUND

K.S. turned twenty-one (21) in late March 2014.[9] She had been scheduled to graduate in 2011 but, when she was unable to complete the required credits by that

---

[9] Her precise birthday is immaterial and, in the interests of privacy, and notwithstanding that a pseudonym is used here, there is no need to disclose it.

time with classroom learning, alternatives kicked in that were designed to enable her to earn a high school diploma. As of 2011, from the time she returned from her last residential educational placement, she was participating in two types of learning consistent with her IEP instead of attending school.[10]  Those services continued as a result of the filing of the class action until her 22nd birthday in late March 2015. She was receiving tutoring in certain subjects and participating in a "virtual credit retrieval program" of online learning in other subjects. Both types of education were not offered simultaneously in the same subject. As described by the hearing officer, "[t]hese services were variously provided in the Warwick library, school locations, and other places, e.g. the student was enrolled at a private gym at public expense as part of her curriculum." (Adm.Dec., ECF No. 1-3 at p. 6.)  Integral to K.S.'s participation was Warwick's commitment to provide two additional essential services: transportation to the place of learning and a social worker to accompany her because of her anxiety. One of the social worker's primary tasks seems to have been to facilitate K.C.'s use of the transportation in spite of her anxieties. K.S. had a particular fear of buses, so for much of the year Warwick supplied a van to pick her up at her home and deliver her and her social worker to the site of the services.

The situation after K.S.'s 21st birthday began to deteriorate when Heidi Fanion, her social worker (who is a defendant here), suffered an injury that required her to go out on medical leave in the Spring of 2014. The district, which contended it could not find a qualified social worker substitute, replaced her with a guidance

---

[10]  K.S.'s IEP is ECF No. 1-1.

counselor. C.S., on K.S.'s behalf, accepted the substitution. When Fanion returned in June 2014, she resumed her duties. K.S. ultimately became dissatisfied with her, however, claiming that she had "changed" her behavior, becoming less accommodating.

In November 2014, K.S. delivered a child and stayed out of school until mid-December, when she attended for one day. By January of 2015, the parties had reached an impasse, apparently caused by the transportation situation. On "at least" three occasions in December and January, the district had sent a van to pick K.S. up at her home, but she had declined to go. As a result, the district refused to send a van any longer and relocated the tutoring to a public library near K.S.'s home. The district advised that along with discontinuation of the van, the social worker would no longer accompany K.S. to tutoring. *Id.* The district ultimately offered to continue bus transportation through the winter until K.S.'s 22nd birthday, as well as a social worker and tutoring, but that offer was declined and, after the one occasion in December 2014, K.S. no longer attended school in the Warwick district.

On appeal from the administrative agency decision, K.S. presses the same claims as she did through the exhaustion process. When examining the evidence against the legal requirement to provide a FAPE, I am guided by the principle that adherence to and implementation of an IEP need not be perfect, *Sumter County School Dist. 17 v. Heffernan ex rel TH,* 642 F.3d 478, 484 (4th Cir. 2011), but a substantial or material deviation may support the conclusion that a FAPE was denied. *Neosho R-V Sch. Dist. v. Clark,* 315 F.3d 1022, 1027 n. 3 (8th Cir. 2003).

*Accord, Mr. and Mrs. C v. Maine Sch. Admin. Dist. No. 6,* Civil No. 06-198-P-H, 2007 WL 4206166 at *24 (D. Me. Nov. 28, 2007). "[A] party challenging the implementation of an IEP must show more than a *de minimus* failure to implement all elements of that IEP, and, instead, must demonstrate [a failure] to implement substantial or significant provisions of the IEP." *Houston Indep. School Dist. v. Bobby R.,* 200 F.3d 341, 349 (5th Cir. 2000), *cert den* 531 U.S. 817 (2000).

## COUNT I

K.S. contends that the implementation of her IEP, and the services provided, were faulty in the following respects.[11]

1. <u>Inadequate transportation</u>. K.S. claims the van sometimes did not come, and the district failed her by offering only bus service as a substitute in the winter of 2015. K.S. acknowledged, however, in her testimony that the IEP did not specify the type of transportation to be provided. Mary Leone, the Warwick school administrator,[12] testified that C.S. had become unhappy with her social worker, Ms. Fanion, and refused to accept her as a support person. But, without a support person, K.S. would not get into the van. Apparently, the public library, where tutoring was moved to, was within walking distance of K.S.'s home, but she testified she never walked there.

---

[11] These contentions are essentially the same ones brought in K.S.'s Request for a due process hearing. (ECF No. 1-2, pp 3 - 8).
[12] Ms. Leone testified she came out of retirement to assist Warwick with K.S.'s education because everyone else familiar with K.S. had left the Warwick system.

The record is devoid of evidence contradicting Warwick's testimony that transportation services were virtually always available. Any occasions when the van might not have come were, if they occurred, episodic and inconsequential.[13] Moreover, Warwick's response to K.S.'s refusal to use the van after November 2014 was reasonable in light of the fact that, as the plaintiffs acknowledge, the IEP did not specify private vehicle transportation. To the extent that K.S. contends that Ms. Fanion texted her in anticipation of the van's arrival during the early part of 2014, but that neither her substitute while she was on medical leave nor Ms. Fanion herself when she returned from leave did so, those texts were not required. Neither was it required that Ms. Fanion get out of the van and meet K.S. at her door to walk her to the van; Ms. Fanion denied doing that, but even if she did, her withdrawal of that courtesy when she returned from medical leave in no way violated the IEP.

2. <u>Inadequate tutoring and/or credit retrieval</u>. K.S. was at times unhappy with the decision of Warwick to offer tutoring or credit retrieval. In one instance, she wanted tutoring to assist her with online credit-retrieval in chemistry. K.S. also wanted Warwick to provide her with computer access at home so her mother wouldn't have to pay for internet; nothing in the IEP required that, and Warwick's reliance on computer availability at the library near K.S.'s home was reasonable.

---

[13] There may have been one or two occasions when the van was not available, separate from its discontinuance in January 2015. The hearing officer found that testimony to this effect from C.S. and K.S. "[did] not coincide with that of school personnel." (Adm. Dec., ECF No. 1-3, p. 32). Even if the testimony of the plaintiffs were credited, however, this would constitute a *de minimus* deviation from the I.E.P.

The IEP did not require Warwick to provide both types of learning simultaneously and, indeed, on occasion such as when Warwick paid for private gym membership, Warwick attempted to respond to K.S.'s needs even when they required less-orthodox methods.[14] The testimony of administrator Leone that K.S.'s attendance at best was sporadic is credible and accepted by the court. She attended 34 sessions but was absent 71 to 74 sessions in the year between her 21st and 22nd birthdays. (ECF No. 18-1, pp 221). K.S. cancelled 68% of the sessions. Ms. Fanion testified that not infrequently when she texted K.S. that the van was on its way, she received a response that K.S. would not be attending, or K.S. would refuse the van when it arrived.

    3. <u>Social worker services</u>. K.S. puts forth two contentions in support of her claim that the IEP was violated by an inadequate provision of social worker services. First, she asserts that when Ms. Fanion went on medical leave for five months, her substitute was inadequate because she was a guidance counselor not a social worker and because she was not as supportive as Ms. Fanion. Administrator Leone testified that the district could not find a qualified social worker who would bid for the assignment and no one expected Ms. Fanion to be out for so long. The substitute, Donna Nassa, was a guidance counselor with certification in special education. Second, she asserts that Ms. Fanion returned from medical leave a "changed" person,

---

[14] Online credit-retrieval in chemistry apparently proved too difficult for K.S. Chemistry therefore stopped in order to allow her to concentrate on English, health and physical education in the Spring of 2014. Chemistry restarted in August 2014 with a tutor, even though Warwick ordinarily did not offer summer sessions.

less supportive and less accommodating. C.S. requested that Warwick replace Ms. Fanion with another social worker, but the City did not do so.

The quick answer to the Fanion-Nassa substitution is that both C.S. and K.S. accepted Ms. Nassa as a substitute at the time. With respect to any claims of inadequacies of either Ms. Fanion or Ms. Nassa, the complaints are mostly vague[15] and contradicted by Ms. Leone who testified there was no change in services and by Ms. Fanion who testified she did not change her behavior. To the extent there may have been subtle changes, they are too subtle to be reflected in the record and thus not ammunition for this attack. I find, as did the hearing officer, that Warwick's failure to replace Ms. Fanion after C.S. requested a switch was entirely reasonable: K.S. had taken medical leave, she returned for only one session, the district had been unable to find a qualified replacement when Ms. Fanion went on medical leave, and K.S. was within a few months of her 22nd birthday. I find no adverse impact on Warwick's provision of educational services. To the extent that K.S.'s unhappiness with Ms. Fanion led to her rejection of van transportation and, consequently, rejection of any educational services in those last few months, that is regrettable but not supported by any objective justification.

    4. <u>Impeding C.S.'s effectiveness as an advocate</u>. C.S. claims that after the class action lawsuit was filed, she was forbidden from speaking to Warwick school

---

[15] For example, C.S. testified Ms. Nassa was not as "helpful" as Ms. Fanion. Only one example was given – that Ms. Nassa would not come into the apartment lobby to retrieve C.S. to bring her to the van. Ms. Fanion, however, denied that she had ever done that.

14

personnel directly and was told to communicate with them only through Ms. Leone. Ms. Leone testified, and this was not contradicted, that she never forbade K.S. or service providers from talking to each other directly. She did direct C.S. to funnel any complaints related to academics through her office, so that she could discuss them with counsel. There was one undisputed incident when a meeting was scheduled with Ms. Leone and, because C.S. had brought an attorney, Ms. Leone was required by policy to reschedule the meeting so that the City's attorney could attend. Ms. Leone testified that C.S. never contacted her to reschedule.

I find that neither of these issues impeded C.S.'s effectiveness, nor served as a barrier to her advocacy role, nor substantially impaired the provision of a FAPE.

5. <u>Failure of monthly meetings</u>. K.S. contends that Warwick was deficient in failing to hold monthly progress meetings. The hearing officer, based on the testimony and in a reasonable exercise of fact-finding, found that the IEP required only quarterly meetings. C.S. in her testimony agreed that both the IEP and the "stay put" order required only quarterly reports, which she received.

I find the meetings were not inconsistent with the IEP.

## CONCLUSION

For the most part, the complaints of C.S. and K.S. allege deficiencies that were simply not commanded by the IEP. Their dissatisfaction with various situations – for example, the substitution of a bus for the van, the lack of simultaneous tutoring and online instruction in the same subject, the need for a substitute for Ms. Fanion while she was on medical leave, the provision of internet at the nearby library instead

15

of at K.S.'s home – was clearly real and sincere, and explains their frustration with the services Warwick provided. But their unhappiness does not change the fact that the IEP was substantially complied with and, to the extent there were deviations, they were *de minimus* and did not amount to a denial of a FAPE. In conclusion, based on the evidence submitted, K.S. was not denied a meaningful FAPE, she has not sustained her burden on appeal, and therefore the defendants' motion for summary judgment on Count I is GRANTED.

IT IS SO ORDERED:

_____
Mary S. McElroy,
United States District Judge

August 4, 2020